SO ORDERED,





**Judge Jason D. Woodard**

**United States Bankruptcy Judge**

**The Order of the Court is set forth below. The case docket reflects the date entered.**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF MISSISSIPPI

| | | | |
|---|---|---|---|
| In re: | ) | | |
| | ) | | |
| STEVEN KEITH JENKINS, | ) | Case No.: | 19-13234-JDW |
| | ) | | |
| Debtor. | ) | Chapter | 7 |

| | | | |
|---|---|---|---|
| WILLIAM L. FAVA, TRUSTEE, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| v. | ) | A.P. No.: | 20-01070-JDW |
| | ) | | |
| BILLY SWICK, JR. AND | ) | | |
| GULF COAST YACHT WERKS, INC., | ) | | |
| | ) | | |
| Defendants. | ) | | |

## MEMORANDUM OPINION AND ORDER

This matter came before the Court on the *Complaint to Avoid Transfers*

filed by the chapter 7 trustee against the defendants Billy Swick, Jr. and Gulf

Coast Yacht Werks, Inc., and the trustee's *Objection to Claims Filed by Gulf*

1

*Coast Yacht Werks, Inc. & Bill Swick, Jr.*, which were consolidated into the trial of the adversary proceeding.[1]  The competing claims between the parties are unrelated.  The trustee asserts that numerous payments between the debtor and the defendants should be avoided as preferences or postpetition transfers and seeks turnover of those payments.[2]  The defendants contend that they are owed $419,418.34 for work performed by Mr. Swick on a vessel owned by the debtor.

At the trial, the Court heard testimony from five witnesses and received documents into evidence.  Having considered all the evidence, post-trial briefs, and argument of counsel, the Court finds that the bankruptcy estate is due a judgment of $152,500.00 for the avoidable transfers, and Mr. Swick holds a secured claim of $123,200.00.  Setoff of the claims is appropriate, leaving the bankruptcy estate with a claim of $29,300.00.

## I.    JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157(a) and 1334, and the *United States District Court for the Northern District of Mississippi's Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 6, 1984.  This is a core proceeding as set forth in 28

---

[1] (A.P. Dkt. # 1); (Dkt. ## 461, 476). Citations to (A.P. Dkt. # --) refer to docket entries in the adversary proceeding (A.P. No. 20-01070). Citations to (Dkt. # --) refer to docket entries in the underlying bankruptcy case (Case No. 19-13234).
[2] (A.P. Dkt. ## 1, 38). At trial, the trustee abandoned the fraudulent transfer theory asserted in the complaint.

U.S.C. § 157(b)(2)(A), (B), (C), (F), (K), and (O). The parties agree that this Court has jurisdiction to enter a final judgment.[3]

## II.   FACTUAL FINDINGS[4]

The debtor, Steven Keith Jenkins, and the defendant, Billy Swick, Jr., are close friends, as the Court has previously detailed in prior orders and opinions.[5] Mr. Swick is self-employed as the owner of Gulf Coast Yacht Werks, Inc., his co-defendant in this case. The trustee seeks to avoid preferential transfers made by the debtor to the defendants in repayment of a loan.[6]

Mr. Swick asserts a claim for work he completed on a boat owned by the debtor, called the "Game On." Mr. Swick previously contended that work bought him an interest in the boat, but the Court found it was owned solely by the debtor and was property of the bankruptcy estate.[7] When the Court held that Mr. Swick had no ownership interest in the boat, the defendants each filed identical proofs of claim in the underlying bankruptcy case.[8] The trustee objected to both claims.[9]

---

[3] (A.P. Dkt. # 78).
[4] To the extent any findings of fact are considered conclusions of law, they are adopted as such, and vice versa.
[5] (Dkt. # 298).
[6] (A.P. Dkt. ## 1, 38).
[7] (Dkt. # 298).
[8] Claim No. 17-1; Claim No. 18-1.
[9] (Dkt. # 461).

At trial, the Court considered evidence of the competing claims, which are unrelated but asserted between the same parties. Each claim will now be considered in turn.

## A. Preferences

It is uncontroverted that the defendants loaned the debtor at least $100,000 in 2018. A check for $100,000 drawn on the account of Gulf Coast Yacht Werks, Inc., and signed by Mr. Swick, was deposited into the debtor's personal bank account on February 23, 2018.[10] At trial, Mr. Swick testified that he also loaned the debtor an additional $50,000 in cash at that time. The debtor testified that he was loaned some cash beyond the $100,000 check but could not remember the amount. There are no loan documents or other writings to memorialize the loan, which was made between friends with no formal loan terms. There was no interest rate, maturity date, payment installment dates, or installment amounts, nor was there any collateral. There is no evidence of the loan terms beyond the testimony of Mr. Swick and the debtor and the $100,000 check. The evidence showed that the loan was from Mr. Swick personally, even though some of the money originally ran through Gulf Coast. In fact, Mr. Swick testified that he borrowed money from someone

---

[10] Ex. D-1.

else to help make the loan to the debtor. Further, the debtor made all payments on the loan directly to Mr. Swick, not to Gulf Coast.

According to the testimony of both Mr. Swick and the debtor, the purpose of the loan was to help the debtor continue his farming operations. Mr. Swick testified that he believed he would be repaid after the debtor sold his crop. But when the trustee asked about Mr. Swick's prior testimony at a hearing in October 2020 that there were "no terms" to the loan, Mr. Swick stated "I guess I didn't recall at that time." The debtor testified that the loan terms were simply "pay me back when you can." Based on the sparse record, the Court finds that Mr. Swick loaned the debtor around $150,000 and that there were no other terms for repayment. The testimony indicated that Mr. Swick loaned the debtor $150,000. The parties' documentation is virtually non-existent, and the evidence presented at trial did not reflect exactly $150,000 worth of transfers, but Mr. Swick testified that he was repaid in full. Accordingly, the Court will consider only the payments for which it has physical evidence (cancelled checks) and finds those amounts were sufficient to repay the loan in full.

Repayment of the loan was sporadic, and the method was certainly unorthodox. From time to time, the debtor directed his accountant, Jan Hudson, to make payments from accounts he controlled to Mr. Swick. Rather than mail the checks, Ms. Hudson wrote the checks, either signed them or had

5

the debtor sign them, and deposited the checks directly into Mr. Swick's account. How Ms. Hudson obtained deposit slips for Mr. Swick's account, or at a minimum his account number, is unclear. It is equally unclear how she endorsed checks for Mr. Swick. At trial, both Ms. Hudson and Mr. Swick testified that they did not know each other. They both testified that she had no authority to act on his behalf, and she never notified him when she made these deposits. Nevertheless, the payments made it into Mr. Swick's account, and he acknowledged that he knew the deposits were loan payments whenever he saw his bank statements. Ms. Hudson credibly testified that she wrote and deposited each of the checks at the direction of the debtor, and that she never initiated the payments herself. The debtor testified that he directed Ms. Hudson to make those deposits "whenever we have the money." The loan payments are summarized below:[11]

- November 2, 2018 – $60,000.00 deposited into Mr. Swick's account.[12]
- February 25, 2019 – $5,000.00 deposited into Mr. Swick's account.[13]
- March 21, 2019 – $5,000.00 deposited into Mr. Swick's account[14]
- June 18, 2019 – two checks, totaling $65,000.00, deposited into Mr. Swick's account.[15]

---

[11] The transfers occurred when the checks were honored by the bank. *See Barnhill v. Johnson*, 503 U.S. 393, 395 (1992).

[12] Ex. D-2.

[13] Ex. D-4.

[14] Ex. D-5.

[15] Ex. D-6.

- July 26, 2019 – $10,000.00 deposited into Mr. Swick's account.[16]
- September 12, 2019 – $7,500.00 check written to Mr. Swick.[17]

The bankruptcy case was filed on August 12, 2019.[18]  The Court finds that the debtor transferred to Mr. Swick a total of $145,000.00 in the year before the filing of the case, including a total of $75,000.00 transferred within 90 days of the filing of the case.  All but $10,000.00 of the prepetition transfers were made to repay the loan.  The July 26, 2019 receipt of deposit for the $10,000.00 check included a note that it was "not related to the loan from Swick."[19]  This check repaid the cost of a fishing trip fronted by Mr. Swick.

The Court finds that the final transfer, totaling $7,500.00, was made after the filing of the bankruptcy case and was the final payment to satisfy the loan balance.

## B. Claims

The defendants make their own claims, which are unrelated to the loan.[20]  The defendants admitted that their claims are duplicate claims.  It was clear from the evidence at trial that Mr. Swick provided the materials and did the work giving rise to the claim, even though some money may have run

---

[16] Ex. D 7.
[17] Ex. P-14. The court has no evidence of when this check was honored, but the check was written postpetition and therefore must have been honored postpetition. The parties do not dispute that the money was transferred to Mr. Swick.
[18] (Dkt. # 1).
[19] Ex. D-7.
[20] Claim No. 17-1; Claim No. 18-1.

through Gulf Coast.  Those claims are for labor and materials Mr. Swick provided to the boat owned by the debtor, even if he tangentially used his company in the process.  Mr. Swick may have a claim for labor and materials, but the claim of Gulf Coast is due to be disallowed as a duplicate.

The boat is more than 25 years old.  A variety of materials, improvements, and routine maintenance, detailed in the invoices from Mr. Swick, were confirmed by a vessel survey and expert testimony.[21]  The routine maintenance completed by Mr. Swick was required to maintain the condition of the boat.  The other work improved the boat by replacing or adding new parts.  Those improvements included pressure washing, sanding, painting, zinks, cushions, A/C pumps, toilets, window tint, electronics, a fuel bladder, the cockpit floor, a variety of engine parts, fish boxes, tuna tubes, and more.[22] Those improvements are listed in detail in the invoices, which were admitted into evidence.[23]

Mr. Richard Schiehl is an expert in the condition and valuation of vessels. He examined and prepared multiple surveys/reports regarding the boat over the years.  On January 9, 2022, Mr. Schiehl completed a report titled "Repair/Service/Maintenance/Improvement Verification."  In the report, he reviewed the entire set of invoices detailing the labor and materials Mr. Swick

---

[21] Ex. D-8.

[22] Ex. P-8.

[23] *Id.*

provided to the boat.  All but two invoices were marked as either confirming the work had been completed or that the work was routine maintenance.  One invoice was marked as "not related" to improvements on the boat because it listed only shirts and visors.  Another invoice was created after Mr. Schiehl's most recent survey.  The Court found Mr. Schiehl's disinterested testimony to be credible and finds that the invoices accurately reflect the value of those materials and services, which total $419,418.34.  The most recent sale price of the boat did not fully reflect the value of those improvements because water in the engine later decreased the boat's value.  But the Court finds that the labor and materials described in the invoices did improve the boat at the time, and were provided at the direction of the debtor, who was the owner of the boat.

## III.   CONCLUSIONS OF LAW

### A. Avoidable Transfers

The trustee asserts that $145,000.00 of prepetition payments were preferences and $7,500.00 was a postpetition transfer.  He seeks to avoid all the transfers and recover those amounts for the estate.

### 1.  Preferences

"A preference is a transfer that enables a creditor to receive payment of a greater percentage of his claim against the debtor than he would have received if the transfer had not been made and he had participated in the

distribution of the assets of the bankrupt estate."[24]   The term "transfer" is defined, in pertinent part, by the Bankruptcy Code as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with [. . .] property [. . .] or an interest in property."[25]   Honored checks are transfers.[26]   A transfer may be avoided as a preference under 11 U.S.C. § 547(b), which provides:

> **(b)** Except as provided in subsections (c), (i), and (j) of this section, the trustee may, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c), avoid any transfer of an interest of the debtor in property--
>> **(1)** to or for the benefit of a creditor;
>> **(2)** for or on account of an antecedent debt owed by the debtor before such transfer was made;
>> **(3)** made while the debtor was insolvent;
>> **(4)** made—
>>> **(A)** on or within 90 days before the date of the filing of the petition; or
>>> **(B)** between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>> **(5)** that enables such creditor to receive more than such creditor would receive if--
>>> **(A)** the case were a case under chapter 7 of this title;
>>> **(B)** the transfer had not been made; and
>>> **(C)** such creditor received payment of such debt to the extent provided by the provisions of this title.

---

[24] *Union Bank v. Wolas,* 502 U.S. 151, 160-61 (1991)(quoting H.R.Rep. No. 95–595, at 177-178, U.S.Code Cong. & Admin.News 1978, pp. 6137, 6138).
[25] 11 U.S.C. § 101(54)(D)(i)-(ii).
[26] *Barnhill*, 503 U.S. at 393-94.

### (1) Transfer made to or for the benefit of a creditor

First, the plaintiff must show that the transfer was made "to or for the benefit of a creditor."[27]  Here, Mr. Swick made a loan to the debtor and had a claim for repayment of that loan, however vague those repayment terms may have been.  The defendants also fronted $10,000.00 for a prepetition fishing trip.  Before the bankruptcy case was filed, the debtor had repaid $135,000.00 of the loan and the full $10,000.00 for the fishing trip.  The first element for avoidance is met.

### (2) Transfer made on account of an antecedent debt

Second, the transfers must have been made for or on account of an antecedent debt owed by the debtor before such transfer was made.[28]  Both the farming loan and the fishing trip costs were fully advanced by Mr. Swick prepetition and before repayment began.  The second element is met for each of the prepetition checks.

### (3) Transfer made while debtor was insolvent

The third element requires the transfer be made while the debtor was insolvent.[29] The Bankruptcy Code defines insolvency as a:

---

[27] 11 U.S.C. § 547(b)(1).

[28] 11 U.S.C. § 547(b)(2).

[29] 11 U.S.C. § 547(b)(3). 11 U.S.C. § 547(f) provides that "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition."  This presumption serves to shift the burden of production to the defendant, but not the burden of proof, which remains on the estate. *In re Litton*, 580 B.R. 686, 689 (Bankr. N.D. Miss. 2018) (citing *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 34

> financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of-- (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and (ii) property that may be exempted from property of the estate under section 522 of this title.[30]

The debtor's summary of assets, filed under oath, indicates that the debtor's assets totaled $3,638,495.35 and his liabilities totaled $8,311,559.77.[31]   The debtor was therefore insolvent $4,673,064.42 when he filed the bankruptcy petition.[32]   The assets and liabilities listed in the schedules are largely static and did not significantly change between the time the transfers were made beginning in November of 2018 and the petition date.   Further, the debtor testified that his financial condition had not improved during the time between receiving the loan from Mr. Swick in February of 2018 and filing his bankruptcy case.   In fact, he admitted that he could not secure a loan from a bank or professional lender at the time he asked Mr. Swick for the loan.   His bankruptcy schedules also show four collection lawsuits against him, either pending or concluded in the year preceding the bankruptcy petition.[33]   The debtor was insolvent at the time each transfer was made.

---

[30] 11 U.S.C. § 101(32).

(2d Cir. 1996)). In this case, the defendant did not offer any evidence to rebut the presumption that the debtor was insolvent during the 90 days preceding the date of the petition.

[31] (Dkt. # 11)

[32] This does not include the $145,000 transferred by the debtor to Mr. Swick, which should also be considered when determining whether the debtor was insolvent at the time of each transfer.  2 Collier on Bankruptcy ¶ 101.32 (16th ed. 2021).

[33] *Id.*

12

### (4) Transfer made within 90 days of bankruptcy petition, or one year to an insider

Next, the trustee must show that the transfers were made on or within 90 days before the date of the filing of the petition, unless the creditor was an insider, in which case transfers up to one year before the filing may be avoided.[34]  Here, three transfers totaling $75,000.00 were made in the 90 days preceding the filing of the petition.

To avoid the transfers made outside the 90 days, but inside one year, the trustee must prove that Mr. Swick was an insider.  For individual debtors, the statutory definition of an insider "includes . . . (i) [a] relative of the debtor or a general partner of the debtor; (ii) partnership in which the debtor is a general partner; (iii) general partner of the debtor; or (iv) corporation of which the debtor is a director, officer, or personal in control."[35]  Mr. Swick does not fall within any of these categories and is not a statutory insider.

The trustee argues that Mr. Swick is a "non-statutory insider," which is a somewhat extratextual category recognized by the United States Supreme Court.[36]  The Supreme Court notes that the Bankruptcy Code's rules of construction provide that the terms "include" and "including" in § 101(31)(A)

---

[34] 11 U.S.C. § 547(b)(4).

[35] 11 U.S.C. § 101(31)(A).

[36] *U.S. Bank Nat'l Ass'n v. Village at Lakeridge, LLC*, 138 S. Ct. 960, 963 (2018). The Supreme Court explained that in determining whether a party is a "non-statutory insider," courts generally focus on whether the transactions were conducted at an arm's length.

are not limiting, and because non-limiting language is used, "courts have long viewed [the Code's] list of insiders as non-exhaustive."[37] Though a creditor may be considered an insider even if he does not fall neatly under one of the enumerated definitions in the Bankruptcy Code, the Supreme Court has not established a uniform test for non-statutory insider status.[38] Instead, the Supreme Court has held that "[t]o decide whether a particular creditor is a non-statutory insider, a bankruptcy judge must tackle three kinds of issues— the first purely legal, the next purely factual, the last a combination of the other two."[39]

First, the Court "must settle on a legal test to determine whether [Mr. Swick] is a non-statutory insider."[40] That election is easy here, as the Court of Appeals for the Fifth Circuit uses two primary factors to assess non-statutory insider status. Those factors are "(1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length."[41] Next, "[a]long

---

[37] *Id.* (citing 11 U.S.C. § 102(3)).

[38] *Id.* at 963-64.

[39] *Id.* at 965.

[40] *Id.*

[41] *In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992). *See also In re Think3, Inc.*, 529 B.R. 147, 190 (Bankr. W.D. Tex. 2015) (applying the non-statutory insider analysis outlined in *Holloway*). Other circuits apply similar tests. *See e.g. In re Village at Lakeridge, LLC*, 814 F.3d 993, 1001 (9th Cir. 2016); *In re Alpha Protective Servs., Inc.*, 570 B.R. 897 (Bankr. M.D. Ga. 2017) (citing *Anstine v. Carl Zeiss Meditect AG (In re U.S. Medical, Inc.)*, 531 F.3d 1272, 1280 (10th Cir. 2008) (finding that despite the absence of intentional or influential control over a debtor, the Congressional intent behind the term "insider" is "one who has a

with adopting a legal standard, a bankruptcy court evaluating insider status must make findings of what [the Supreme Court has] called 'basic' or 'historical' fact—addressing questions of who did what, when or where, how or why."[42]  Finally, this Court must "determine whether the historical facts found satisfy the legal test chosen for conferring non-statutory insider status."[43]

Here, the debtor and Mr. Swick had a markedly close relationship.  They have known each other for 12 to 14 years.  Both men describe themselves as "very good friends."  The debtor testified that he and Mr. Swick took upwards of ten fishing trips a year, each lasting multiple days, including trips since the debtor filed bankruptcy.  Both testified that Mr. Swick often fronted the cost of those trips, though neither offered documentation nor had specific memory of when or what amounts the debtor owed Mr. Swick for those trips.  The debtor testified that he simply relied on Mr. Swick to accurately represent what was owed for those trips.  Additionally, Mr. Swick loaned $150,000 to the debtor without any documentation or collateral, with the sole (verbal) loan term to "pay me back when you can."  Mr. Swick testified that he loaned the money to the debtor for no other reason than that they are good friends, and that he wouldn't lend such large sums to just any friend.  In fact, Mr. Swick also

---

sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor")).

[42] *Village at Lakeridge, LLC*, 138 S. Ct. at 966 (citing *Thompson v. Keohane*, 516 U.S. 99, 111, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)).

[43] *Id.*

testified that he borrowed money from another individual to fund his loan to the debtor.  Meanwhile, Ms. Hudson regularly endorsed checks on behalf of and at the direction of the debtor before depositing those checks into Mr. Swick's account.  Mr. Swick testified that when he saw deposits appear in his account, he knew they were related to the loan.  Further, the debtor repaid his good friend in full, despite his insolvency and the fact that he was not paying his other creditors. This is the very scenario the preference statute is designed to avoid.[44]

Further, these transactions were not conducted at arm's length.  "An arm's-length transaction is '[a] transaction between two unrelated and unaffiliated parties' or '[a] transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises.'"[45]  Put differently, the Fifth Circuit has explained "where related parties are involved, an 'arm's length transaction' is one that is substantively the same as transactions among strangers."[46]  While some courts look at the level of control a lender has over a debtor as a significant factor in

_____

[44] *In re Conard Corp.*, 806 F.2d 610, 612 (5th Cir. 1986) ("The very purpose of the preference law [. . .] is to restore equity among creditors of the debtor's estate by limiting the debtor's ability to prefer the interests of some creditors over others as he slides into bankruptcy").

[45] *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 363 n.92 (S.D. Tex. 2008). (quoting Black's Law Dictionary (8th ed.2004)).

[46] *Claimant ID 100190818 v. BP Expl. & Prod., Inc.*, 718 F. App'x 220, 223 (5th Cir. 2018) (finding that the parties' transactions were "'different from what would have been coordinated with an unrelated third party ... in the marketplace,' which is consistent with the plain meaning of 'arm's length transaction'") (citing Black's Law Dictionary (10th ed. 2014)).

assessing if the transaction was at arm's length, the Fifth Circuit, like others, has found that control is "much less relevant in situations . . . involving loans made with no commercial motivation."[47] Here, the debtor testified that he could not obtain financing from a bank or any other lender, so he asked his friend for help. Mr. Swick loaned the debtor the money at a time he knew the debtor was having financial difficulties, yet the loan was not secured by any collateral and there was no written documentation associated with the loan. The loan had no maturity date, interest rate, or other payment terms. Mr. Swick was not a professional lender and he testified that this was the first and only time he loaned this amount of money to anyone. The loan between Mr. Swick and the debtor was not commercially motivated and the terms were not arm's length. The only basis for the loan was their friendship.

The Court concludes Mr. Swick is a non-statutory insider of the debtor. Accordingly, any transfer made within ninety days and one year before the date of the filing of the bankruptcy case is avoidable.[48] In total, the debtor transferred $145,000.00 to Mr. Swick in the year preceding the filing of the petition.

---

[47] *Holloway*, 955 F.2d at 1014. *See also Anstine v. Carl Zeiss Meditect AG (In re U.S. Medical, Inc.)*, 531 F.3d 1272, 1280 (10th Cir. 2008). Even if control was necessary, the facts here are still sufficient. Mr. Swick maintained possession of the debtor's boat, made expensive repairs on it, and planned fishing trips. The debtor even testified that "I just paid him what he told me I owed him."
[48] 11 U.S.C. § 547(b).

(5) Transfer enabled creditor to receive more than a chapter 7 distribution

The final element the trustee must prove is that the transfer enabled Mr. Swick to receive more than he would have received if "(A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title."[49]   Effectively, § 547(b)(5) "requires a determination that the creditor in question received more than other creditors of the same class would receive in liquidation."[50]   The Court has found that the debtor's debts exceeded his assets by a factor of more than 2:1.   Mr. Swick testified that the debtor paid him in full on the loan.   But for the transfers, Mr. Swick would not have been fully repaid for the loan or the fishing trip.   With insufficient assets to pay all liabilities in this chapter 7 case, no other nonpriority unsecured creditors will be paid in full.   Accordingly, each of the prepetition transfers enabled Mr. Swick to receive more than he would have received in a liquidation.

2.  Postpetition Transfer

The trustee also seeks to avoid a single postpetition transfer.   Section 549(a) provides that, unless some exception applies, "the trustee may avoid a transfer of property of the estate— (1) that occurs after the commencement of the case; and (2)(A) that is authorized only under section 303(f) or 542(c) of this

---

[49] 11 U.S.C § 547(b)5).
[50] *In re Acadiana Elec. Serv., Inc.*, 66 B.R. 164, 166 (Bankr. W.D. La. 1986).

title; or (B) that is not authorized under this title or by the court." The $7,500.00 postpetition check was written on September 12, 2019, and honored thereafter, well after the petition date. None of the statutory exceptions apply to this postpetition transfer, and the $7,500.00 postpetition transfer is also avoidable.

To summarize, $145,000.00 of prepetition transfers are due to be avoided as preferences and $7,500.00 is due to be avoided as an impermissible postpetition transfer. Both are recoverable under 11 U.S.C. § 550.

## B. Objection to Claim

The Court now turns to Mr. Swick's claim. On December 14, 2020, he filed a proof of claim against the debtor in the amount of $419,418.34. The claim is for the amount Mr. Swick alleges he is owed for materials and work he did on the boat.[51] The trustee objected, disputing the secured status of the claim and whether the debts are owed by the debtor.[52]

At trial, the trustee also alleged that the proofs of claim were untimely. Federal Rule of Bankruptcy Procedure 7015 provides that Federal Rule of Civil Procedure 15 applies in adversary proceedings. It provides:

> If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting

---

[51] Claim No. 17-1.
[52] (Dkt. # 461).

party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits [. . . .] When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

While Mr. Swick asserts that the trustee's timeliness objection was not raised in the pleadings, he offers no evidence that he was prejudiced by the trustee's failure to raise the timeliness objection before trial. The parties conducted lengthy and robust discovery and were permitted to file post-trial briefs. Accordingly, the Court will consider the trustee's timeliness objection.

### 1. Claim Timeliness

Mr. Swick previously contended that he owned a 50% interest in the boat by providing labor and materials to refurbish the boat.[53]  The Court rejected that contention and found that the debtor was the sole owner of the boat.[54]  At that point, Mr. Swick pivoted and filed his proof of claim for the work and materials he had provided to the boat.[55]  But that claim was not filed until December 14, 2020, well after the deadline to file claims, which was February 4, 2020.[56]  Mr. Swick argues that because he did not believe he was a creditor

---

[53] (Dkt. # 298)

[54] *Id.*

[55] Claim No. 17-1.

[56] (Dkt. # 20).

until the Court determined that he was not an owner of the boat on October 22, 2020, he could not have filed a claim. Mr. Swick contends that his proof of claim filed within six weeks of the Court's ruling on the ownership of the boat should be considered timely.

Bankruptcy courts cannot exercise their equitable power to allow a late filed claim if no Rule 3002(c) exceptions apply.[57] Mr. Swick does not claim to fall under any of the exceptions. Further, 11 U.S.C. § 501(a) provides that a creditor may file a proof of claim and that an equity security holder may file a proof of interest. Though he may not have believed he was a creditor, he did contend that he was a co-owner and certainly could have filed a proof of interest. Either a proof of claim or a proof of interest would have protected his rights. He failed to file either before the bar date. Mr. Swick was on notice of the bankruptcy case and that his ownership of the boat was under serious question. Only after losing the case for his ownership in the boat did he try to protect his own interests by filing a claim.

---

[57] *Moushigian v. Marderosian*, 764 F.3d 123, 128 (1st Cir. 2014) (§ 105(a) should not be used to vary the deadlines in the Bankruptcy Rules); *In re Dickinson*, 242 F.3d 388, at *2 (10th Cir. 2000) (§ 105(a) should be used to vary the deadlines in the Bankruptcy Rules only to correct notice problems caused by the court); *In re Sunland, Inc.*, 534 B.R. 793, 799 (Bankr. D.N.M. 2015) (citing *In re S.A. Morris Paving Co.*, 92 B.R. 161, 163 (Bankr.W.D.Va.1988) (court lacks equitable power to enlarge the time for filing a proof of claim unless one of the six situations in Rule 3002(c) exists); *In re Jemal*, 496 B.R. 697, 701 (Bankr.E.D.N.Y 2013); *In re Hyde*, 413 B.R. 719, 721 (Bankr.D.Idaho 2009) (applying Rule 3002(c) to a late-filed claim in a Chapter 12 case); *In re Hayes*, 327 B.R. 453, 458 (Bankr.C.D.Cal.2005); *American Express Centurion Bank v. Schoofs (In re Schoofs)*, 115 B.R. 1, 4 (Bankr.D.D.C.1990) (court doubted whether § 105(a) could be used to override the Bankruptcy Rules)).

Further, the Bankruptcy Rules contemplate this scenario.  Bankruptcy Rule 3002(c)(3) provides that:

> [a]n unsecured claim which arises in favor of an entity or becomes allowable as a result of a judgment may be filed within 30 days after the judgment becomes final if the judgment is for the recovery of money or property from that entity **or denies or avoids the entity's interest in property**.  If the judgment imposes a liability which is not satisfied, or a duty which is not performed within such period or such further time as the court may permit, the claim shall not be allowed.[58]

Mr. Swick arguably had an opportunity to file the proof of claim in the 30 days following the Court's ruling that he had no ownership interest in the boat. Instead, he waited 53 days.  The Court cannot allow the late-filed claim against the constructs of the Code.

While the late-filed claim must be disallowed, the Bankruptcy Code does not require a secured creditor to file a proof of claim.[59]

> The law is well established that ordinarily, liens pass through bankruptcy unaffected [. . .] and a secured creditor can ignore the bankruptcy case and look solely to his collateral in satisfaction of the debt (although he will be stayed from doing so during the pendency of the case) [. . . .] The disallowance of a proof of claim, without more, does not have the effect of extinguishing the lien.

---

[58] FED. R. BANKR. P. 3002(c)(3)(emphasis added).

[59] *In re Kleibrink*, 346 B.R. 734, 747 (Bankr. N.D. Tex. 2006), aff'd, No. 3:07-CV-0088-K, 2007 WL 2438359 (N.D. Tex. Aug. 28, 2007), aff'd, 621 F.3d 370 (5th Cir. 2010) (citing 11 U.S.C. § 501 (a creditor "may" file a proof of claim); Fed. R. Bankr. P. 3002(a) ("an *unsecured* … creditor must file a proof of claim … for the claim … to be allowed") (emphasis added)).

> The disallowance of a claim means only that the creditor is not
> entitled to a distribution from the estate.[60]

Though Mr. Swick's proof of claim is due to be disallowed, he may retain his

lien rights, if any exist.

### 2. Maritime Lien

Mr. Swick argues that he is a secured creditor by virtue of a maritime

lien.  The boat was registered with the United State Coast Guard, so the

Commercial Instrument and Maritime Liens Act ("CIMLA") applies.[61]

CIMLA provides that "a person providing necessaries to a vessel on the order

of the owner or a person authorized by the owner [. . .] has a maritime lien on

the vessel [and] may bring a civil action in rem to enforce the lien."[62]  As the

Fifth Circuit has explained, a maritime lien "'is a special property right in the

vessel,' which 'grants the creditor the right to appropriate the vessel, have it

sold, and be repaid the debt from the proceeds.'"[63]  For Mr. Swick to claim a

maritime lien on the boat, he must prove (1) that he provided necessaries to

---

[60] *Kleibrink*, 346 B.R. at 747 (citing In re Orr, 180 F.3d 656, 660 (5th Cir.1999); *In re Kinion*, 207 F.3d 751 (5th Cir.2000)).

[61] *Martin Energy Servs., L.L.C. v. Bourbon Petrel M/V*, 962 F.3d 827, 830 (5th Cir. 2020) (citing *ING Bank N.V. v. Bomin Bunker Oil Corp.*, 953 F.3d 390, 393 (5th Cir. 2020) (quoting *Valero Mktg. & Supply Co. v. M/V Almi Sun, IMO* No. 9579535, 893 F.3d 290, 292 (5th Cir. 2018))).

[62] 46 U.S.C. § 31342(a)(1), (2). Federal law defines a "vessel" as including "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 46 U.S.C. § 115; 1 U.S.C. § 3.  Because the Game On falls under the definition of a vessel, CIMLA applies.

[63] *Martin Energy*, 962 F.3d at 830 (quoting *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir. 1986) (en banc).  *See also* 46 U.S.C. § 31326(a) & (b).

the vessel, and (2) that he did so at the direction of the owner, or someone authorized by the owner.[64]

CIMLA defines necessaries to include "repairs, supplies, towage, and the use of a dry dock or marine railway."[65]  The Fifth Circuit has noted that the statutory definition of necessaries is just an "illustrative list," and explained that "[n]ecessaries are the things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged."[66]  In previous cases, the Fifth Circuit expounded that necessaries are "goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function," which may include "money, labor and skill, and personal services as well as materials."[67]  These are considered necessary based on "the present, apparent want of the vessel, not the character of the thing supplied."[68]

The boat was being used and outfitted as a fishing vessel, available for offshore charters.  The Court has found that the improvements on the boat were necessary and appropriate for this purpose.  The trustee's best argument for items that may not be strictly "necessary" were the shirts and visors.  But even those may be used for advertising or promotion, which the Fifth Circuit

---

[64] 46 U.S.C. § 31342(a).
[65] 46 U.S.C.A. § 31301(4).
[66] *Martin Energy Services*, 962 F.3d at 831.
[67] *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 603 (5th Cir. 1986).
[68] *Id.* (citing 2 Benedict on Admiralty s 34 (7th ed. 1984)).

has held "is sufficient to give rise to a maritime lien."[69]   All of the invoices

reflect necessaries which repaired or upgraded the vessel, equipping it for

fishing trips, which is the purpose of the vessel.

Mr. Swick must also show that he provided the necessaries at the

direction of the owner, or someone authorized by the owner.[70]   The necessaries

were provided to the boat at the direction of the debtor, who owned the vessel.

Accordingly, the defendants had a maritime lien encumbering the boat, which

has already been sold by the trustee with the approval of this Court.[71]

Under Section 506(a), a creditor has a secured claim to the extent of the

value of its interest in the property.[72]   The trustee sold the boat for

$123,200.00.[73]   The defendants admit the secured portion of their claim is

limited to this amount.[74]   Accordingly, Mr. Swick holds a secured claim of

$123,200.00.

---

[69] *Id.* (citing *Colonial Press of Miami, Inc. v. The Allen's Cay*, 277 F.2d 540 (5th Cir.1960); *Stern, Hays, & Lang, Inc. v. M/V NILI*, 407 F.2d 549, 551 (5th Cir.1969)).

[70] 46 U.S.C. § 31342(a).

[71] (Dkt. # 298).  *See In re Taylor*, 289 B.R. 379, 387 (Bankr. N.D. Ind. 2003) ("if, during the administration of the bankruptcy estate, the creditor's collateral is liquidated, its secured claim is paid out of the sale proceeds"); *In re Swann*, 149 B.R. 137, 145 (Bankr. D.S.D. 1993) ("Proceeds from a trustee's sale of property are first used to extinguish any valid liens on the property, after which, the remaining proceeds will be distributed to satisfy claims against the estate in accordance with the provisions of Section 726");

[72] 11 U.S.C. §506(a).

[73] (Dkt. # 422). Upon sale, the lien shifted from the boat to the proceeds of the sale.  *In re Lambdin*, 33 B.R. 11, 12–13 (Bankr. M.D. Tenn. 1983) ("Since the estate only includes the debtor's interest in property as of the commencement of the bankruptcy case, the proceeds from the trustee's sale of these properties would first have to be used to extinguish any valid liens on the properties").

[74] (A.P. Dkt. # 98, ¶ 22).

## C. Setoff and Recoupment

Mr. Swick asserts that recoupment or setoff should apply to reduce his liability for the avoidable transfers.  Recoupment "allows a defendant to reduce the amount of a plaintiff's claim by asserting a claim against the plaintiff which arose out of the same transaction to arrive at a just and proper liability on the plaintiff's claim."[75]  The claims asserted by the trustee arise from the loan from Mr. Swick to the debtor.  Mr. Swick's claims, on the other hand, arise from improvements made to the boat.  Because the competing claims between the trustee and Mr. Swick did not arise from the same transaction, recoupment does not apply here.

"The right of setoff [. . .] allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding "the absurdity of making A pay B when B owes A."[76]  The Bankruptcy Code does not create setoff rights, which arise from applicable non-bankruptcy law.[77]   The Bankruptcy Code does provide that "[e]xcept as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any

---

[75] *Kadonsky v. United States*, 216 F.3d 499, 507 (5th Cir. 2000).
[76] *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995).
[77] *In re Williams*, 61 B.R. 567, 571 (Bankr. N.D. Tex. 1986) ("Although Section 553 preserves the right of setoff, the nature, existence and enforceability of claims sought to be setoff are determined by applying the law of the state where the operative facts occurred").

right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case. . ..”[78]

The elements of setoff are: (1) a debt exists from the creditor to the debtor and that debt arose prior to the commencement of the bankruptcy case, (2) the creditor has a claim against the debtor which arose prior to the commencement of the bankruptcy case, and (3) the debt and the claim are mutual obligations.[79]

The general rule is that a claim is considered to have arisen prepetition if liability arose before the petition date.[80]  Further, “[t]he character of a claim is not transformed from prepetition to postpetition simply because it is contingent, unliquidated or unmatured when the debtor's petition is filed.”[81] And a debt can be owing prepetition even though it would never have come into existence except for postpetition events.[82]  Here, the estate has a claim against Mr. Swick for the preferential transfers.   That liability arose from the prepetition transfers, even though the claim did not come into existence until the preferences were avoided.  Mr. Swick has his own claim against the debtor

---

[78] 11 U.S.C. § 553.  *See also Strumpf*, 516 U.S. at 20.  The right to setoff is available in this case under either Mississippi or Florida law.  *See e.g. In re Morgan*, 77 B.R. 81, 82 (Bankr. S.D. Miss. 1987); *Ebsary Found. Co. v. Barnett Bank of S. Fla., N.A.*, 569 So. 2d 806, 806 (Fla. Dist. Ct. App. 1990).

[79] *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1035 (5th Cir. 1987).

[80] *Id.* at 1036.  In pertinent part, a "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, natural, unnatural, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5).

[81] Id. (quoting *Stair v. Hamilton Bank of Morristown (In re Morristown Lincoln–Mercury, Inc.)*, 42 B.R. 413, 418–19 (Bankr. E.D. Tenn. 1984)).

[82] *U.S. Through Agr. Stabilization & Conservation Serv. v. Gerth*, 991 F.2d 1428, 1434 (8th Cir. 1993).

for the materials he provided and the work he completed on the boat.  All of that work was also done prepetition.  Elements one and two are satisfied.

For the debts to be considered mutual obligations, "each party must own his claim in his own right severally, with the right to collect in his own name against the debtor in his own right and severally."[83]  The respective claims are mutual obligations.  Setoff is appropriate here.

## IV.  CONCLUSION

Mr. Swick owes the estate $152,500.00 for the avoided transfers.[84]  Mr. Swick holds a secured claim against the estate for $123,200.00.  Those claims may be setoff.  Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED** that the trustee's objection to claim is **SUSTAINED** as to Claim No. 18 and that claim is **DISALLOWED** as a duplicate.  The trustee's claim is likewise **SUSTAINED** as to the unsecured portion of Claim No. 17, which is **DISALLOWED**, leaving Mr. Swick with a secured claim of $123,200.00 from the boat sale proceeds.  The bankruptcy estate **HOLDS** a claim against Mr. Swick for the avoidance actions in the amount of $152,500.00.

---

[83] *Id.* at 1036 (quoting *In re V.N. DePrizio Construction Co.*, 52 B.R. 283 (Bankr. N.D. Ill. 1985) (quoting 4 Collier on Bankruptcy ¶ 553.04, at 553.30 (15th ed. 1985).  *See also In re SemCrude, L.P.*, 399 B.R. 388, 393 (Bankr. D. Del. 2009), aff'd, 428 B.R. 590 (D. Del. 2010).
[84] The postpetition transfer of $10,000.00 is not part of this setoff analysis.  Because Mr. Swick's secured claim is less than the avoided prepetition transfers, excluding the postpetition transfer has no impact on the outcome.

After setoff, the trustee is to be **AWARDED** a judgment in the amount of $29,300.00.  A separate judgment in this amount will be entered pursuant to Federal Rule of Bankruptcy Procedure 7058.